481 A.2d 319

Matthew J. AUGUSTINE and Michael H. Augustine, minors, By their parents and natural guardians, Henry D. AUGUSTINE and Joanne C. Augustine, and Henry D. Augustine and Joanne C. Augustine, in their own right, Appellants,

v.

Juan F. DELGADO, M.D., John Pagana, M.D., and Sunbury Community Hospital.

Superior Court of Pennsylvania.

Argued April 5, 1984.

Filed July 13, 1984.

Reargument Denied Sept. 21, 1984.

Petition for Allowance of Appeal Denied Feb. 21, 1985.

Richard C. Angino, Harrisburg, for appellants.

Christian S. Erb, Jr., Harrisburg, for appellees.

Before WICKERSHAM, OLSZEWSKI and HOFFMAN, JJ.

HOFFMAN, Judge:

Appellants contend that the lower court erred in (1) permitting the testimony of Dr. Naeye, one of appellees' expert witnesses; (2) excluding a significant part of the deposition of Dr. Perkins, one of appellants' experts; and (3) allowing defense counsel to aver an "unfavorable inference" from appellants' failure to call certain expert witnesses. Upon thorough review of the record and complete exploration of appellants' claims, we conclude that there was no error and, accordingly, affirm.

The record reveals the following facts: On October 1, 1975, appellant Joanne Augustine gave birth to twin boys at the Sunbury Community Hospital in Sunbury, Pennsylvania. Appellee Dr. Juan Delgado, an obstetrician/gynecologist, cared for Mrs. Augustine during the course of her pregnancy. Following the twins' birth, Dr. John Pagana, a pediatrician, assumed care of the children. In March, 1977, after the twins were diagnosed as suffering from cerebal palsy and mental retardation, appellants, Mrs. Augustine

and her husband, brought suit on their own behalf and on behalf of their sons, alleging that the negligence of Sunbury Hospital, and Drs. Delgado and Pagana caused the twins' abnormalities. After lengthy pre-trial discovery and several continuances over a period of approximately two-and-one-half years, the jury trial ultimately commenced on June 15, 1981 and ended a month later. The jury, given a series of special interrogatories by the lower court, concluded that neither Dr. Delgado nor the Sunbury Community Hospital had committed negligence that was a substantial factor in the resulting injury. The jury found Dr. Pagana not negligent. Appellants' post-trial motion, which was denied, and this appeal are limited to Dr. Delgado's negligence, "the other defendants having bought their peace." (Lower Court Opinion at 2).

The crux of appellants' major contention, that the lower court erroneously permitted the testimony of Dr. John Naeye, concerns our interpretation of Pa.R.Civ.P. 4003.5, Discovery of Expert Testimony. This rule provides for the "[d]iscovery of facts known and opinions held by an expert ... acquired or developed in anticipation of litigation or for trial....", Pa.R.Civ.P. 4003.5(a) and, in pertinent part, states:

(1) A party may through interrogatories require

(a) Any other party to identify each person whom the other party expects to call as an expert witness at trial and to state the subject matter on which the expert is expected to testify and

(b) the other party to have each expert so identified by him state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. The party answering the interrogatories may file as his answer a report of the expert or have the interrogatories answered by his expert. The answer or separate report shall be signed by the expert.

(2) Upon cause shown, the court may order further discovery by other means, subject to such restrictions as

to scope and such provisions concerning fees and expenses as the court may deem appropriate.

. . . . .

(c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, his direct testimony at trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer to an interrogatory, separate report, or supplement thereto. However, he shall not be prevented from testifying as to facts or opinions or matters on which he has not been interrogated in the discovery proceedings.[1]

Appellants, in emphasizing their specific allegations concerning Dr. Naeye's testimony, cite the Explanatory Note following Rule 4003.5.

. . . . .

(6) To prevent incomplete or "fudging" of reports which would fail to reveal fully the facts and opinions of the expert or his grounds therefor, subdivision (c) provides that an expert's direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony as set forth in his deposition and answer to interrogatories, separate report or supplements thereto.

---

1. Pa.R.Civ.P. 4003.5 is substantially based on Fed.R.Civ.P. 26(b)(4), 28 U.S.C., which reads in pertinent part:

(4) *Trial Preparation: Experts.* Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. (ii) Upon motion, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions, pursuant to subdivision (b)(4)(C) of this rule, concerning fees and expenses as the court may deem appropriate.

However, he may testify to anything regarding matters in which he was never questioned in the discovery proceedings. This is a new provision not expressly found in the Federal rule. It is implicit in the Federal rule. Where the full scope of the expert's testimony is presented in the answer to interrogatories or the separate report, as provided in subdivisions (a)(1) and (2), this will fix the permissible limits of his testimony at the trial. But, if the inquirer limits his inquiry to one or more specific issues only, the expert is free to testify at trial as to any other relevant issues not included in the discovery. Therefore, what happens at trial may depend upon the manner in which the expert is interrogated. The inquirer may be well adviised to conduct his discovery broadly by paraphrasing the language at 4003.5(a), which will require the expert to state all his opinions and grounds, thus preventing surprise testimony at trial concerning grounds never raised during discovery.

Pa.R.Civ.P. 4003.5 Explanatory Note.

 Appellants argue first, and we agree, that Pa.R. Civ.P. 4003.5 favors liberal discovery of expert witnesses and disfavors unfair and prejudicial surprise. *See* Goodrich-Amram 2d § 4003.5:2 ("The outcome of litigation may be controlled by, or depend to a great extent on, the opinion of an expert, and simple fairness seems reason enough to allow the party against whom that opinion is to be used sufficient time after discovery to develop his case in light of that opinion."). What constitutes surprise and prejudice, however, depends upon the pre-trial particulars of each case. In other words, sufficient time and opportunities to prepare for and counter expert testimony in one case may prove inadequate in another case. Few Pennsylvania appellate court cases have addressed Rule 4003.5 because of its relatively recent promulgation. Allegheny County Rule 212, similar in relevant part to Pa.R.Civ.P. 4003.5, has been construed upon multiple occasions and offers guidance in solving the maze of expert witness discovery. Rule 212 provides, in pertinent part, that:

A. Plaintiff, on or before the date set forth in the notice accompanying the publication of the trial list;

(1) shall serve upon all parties a written statement containing:

. . . . .

(d) The reports of any expert whose opinion will be offered in evidence at the time of trial. Such reports shall include the findings and conclusions of the expert.

Allegheny County Local Rule 212. In *Sindler v. Goldman*, 309 Pa.Superior Ct. 7, 454 A.2d 1054 (1982), decided under Rule 212 and upon which appellants rely, the court noted:

The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits. When expert testimony is involved, it is even more crucial that surprise be prevented, since the attorneys will not have the requisite knowledge of the subject which would effectively rebut unexpected testimony. By allowing for early identification of expert witnesses and their conclusions, the opposing side can prepare to respond appropriately instead of trying to match years of expertise on the spot. Thus, the rule serves as more than a procedural technicality; it provides a shield to prevent the unfair advantage of having a surprise witness testify.

*Id.*, 309 Pa.Superior Ct. at 12, 454 A.2d at 1056. In *Sindler*, the defendant, a physician, did not offer expert opinions when he was deposed; he merely testified as a party. The plaintiffs requested a new trial, however, challenging the part of the defendant's testimony that was expert in nature. This Court concluded that the plaintiffs' ignorance of this proposed expert testimony, coupled with the lost opportunity for an effective rebuttal (because the plaintiffs' witnesses had been previously videotaped), thwarted any opportunity for a fair trial. The *Sindler* court relied upon *Gill v. McGraw Electric Co.*, 264 Pa.Superior Ct. 368, 399 A.2d 1095 (1979), wherein we outlined the following factors necessary to a determination of whether surprise, arising from alleged inadequate pre-trial discovery, resulted in unfair prejudice:

(1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified;

(2) the ability of that party to cure the prejudice;

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court; and

(4) bad faith or willfullness in failing to comply with the court's order.

*Id.*, 264 Pa.Superior Ct. at 382, 399 A.2d at 1102. In *Gill*, the plaintiffs claimed that, contrary to a pre-trial order, they were not informed of two expert witnesses. The court concluded that the defendant's conduct was prejudicial and "put [the plaintiffs] in the position of being unable to offer effective rebuttal—or any rebuttal—of [the defendant's] experts." *Id.*, 264 Pa.Superior Ct. at 383, 399 A.2d at 1103. In *Gill*, as in *Sindler*, the prejudice inured from the plaintiffs not being informed prior to trial of the existence of the expert witnesses who subsequently testified.

Prejudice was also found to result from gaps in pretrial discovery, albeit in a different manner, in *Starr v. Allegheny General Hospital*, 305 Pa.Superior Ct. 215, 451 A.2d 499 (1982), and *Bell v. Western Pennsylvania Hospital*, 293 Pa.Superior Ct. 37, 437 A.2d 978 (1981). In *Bell*, again decided under Allegheny County Rule 212, a defense expert's report submitted to the plaintiff summarily stated that the expert had reviewed the plaintiff's records, could see no negligence on the defendant's part and therefore would appear for the defense. The court determined that, because the report failed to include adequate findings and conclusions, the plaintiff was prejudiced by the expert's trial testimony. In *Starr*, on the other hand, the appellant-plaintiff argued that the expert's reports stated only that her medical condition did not result from the appellee-defendant's negligence, and did not contain theories as to an alternative cause. The expert then testified at trial that the plaintiff's condition was due to her initial injury and not to the defendant's subsequent care. The court stated:

> Although the reports do not specifically contain assertions to the effect that appellant's condition was caused by the initial injury, there is no question that counsel for appellant [plaintiff] was fully aware of the event and, necessarily, in preparing the case, had to take into consideration the possibility that such injury was the cause precipitating her condition. Obviously, appellant was fully informed as to the incident, and certainly could not claim surprise at trial.

*Id.*, 305 Pa.Superior Ct., at 229, 451 A.2d at 505. *See also Nowosielski v. Kryzosiak*, 480 Pa.Superior Ct. 243, 421 A.2d 703 (1980); *Saks v. Jeanes Hospital*, 268 Pa.Superior Ct. 578, 408 A.2d 1153 (1979).

More recently, our Court has had the opportunity to address specifically the questions of possible prejudice and appropriate sanctions under Pa.R.Civ.P. 4003.5. In *Royster v. McGowen Ford, Inc.*, 294 Pa.Superior Ct. 160, 439 A.2d 799 (1982), the lower court granted a non pros after the plaintiff failed to answer expert interrogatories. We reversed and remanded for a determination of prejudice pursuant to the *Gill* factors, stating that

> assuming that a party has not acted in bad faith and has not misrepresented the existence of all experts expected to be called at trial, no sanction should be imposed unless the complaining party shows that he has been prejudiced from properly preparing his case for trial as the result of a dilatory disclosure.

*Id.*, 294 Pa.Superior Ct. at 169, 439 A.2d at 804. *Royster*, however, involved the problem of the total non-disclosure of one expert. More on point is *Kemp v. Qualls*, 326 Pa.Superior Ct. 319, 473 A.2d 1369 (1984), where one issue on appeal was the late disclosure of an expert witness's identity. In *Kemp*, opposing counsel was not informed of the existence of that witness until three days before trial and did not receive the expert's qualifications until the day he testified. The court, relying upon *Gill v. McGraw Electric Co., supra*, wherein the Court emphasized the drastic nature of precluding expert testimony, noted that such preclusion

must be decided under the facts of each case. The *Kemp* Court concluded:

> In this case, it is apparent that the appellant has not demonstrated any real prejudice flowing from the Appellee Quall's untimely disclosures of [the expert's] identity and qualifications. The appellant had thirteen days in which to investigate the reputation and purported expertise of the witness prior to his testimony. Moreover, the lower court expressly offered to accommodate any difficulty caused to Appellant's counsel by the late disclosures concerning [the expert].

*Id.*, 326 Pa.Superior Ct. at 330, 473 A.2d at 1374.

Finally, in *Klyman v. Southeastern Pennsylvania Transportation Authority,* (J. 2484/83, filed April 19, 1984), our Court specifically applied Pa.R.Civ.P. 4003.5 in the context of the lower court's refusal to permit an expert's testimony. In *Klyman,* the plaintiff was involved in a collision with a bus. The plaintiff's response to expert interrogatories was a letter, sent two months later, containing the curriculum vitae of the expert, Dimitry Sergay, and the following:

> Mr. Sergay will testify to his calculations based on the thirty-two feet of skid marks and other evidence in the police report relating to the speed and control of the bus.

*Id.*, slip op. at 5. Opposing counsel immediately requested further summary of the expert's intended testimony. Because that was never provided, the lower court precluded Mr. Sergay's testimony at trial. Our Court agreed, finding "[w]ithout question [that] appellant failed to comply with the requirements of Rule 4003.5." *Id.*, slip op. at 6.[2]

---

**2.** The *Klyman* court noted:

> Even without reliance on the Pennsylvania Rules of Civil Procedure, appellate decisions have addressed the trial court's authority to control the admission of expert testimony. It is well established that the admission of expert testimony is a matter for the discretion of the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion. *Laubach v. Haugh,* [Haigh], 433 Pa. 487, 491, 252 A.2d 682, 683 (1969); *Kubit v. Russ,* 287 Pa.Superior Ct. 28, 429 A.2d 703 (1981).

The course of pre-trial discovery in the instant case has been well-summarized by the lower court:[3]

[O]n May 19, 1981 ... defendant Sunbury Community Hospital's counsel forwarded to all counsel a copy of a report from Richard L. Naeye, M.D., and indicated that Dr. Naeye would be called as a witness at trial. he had first been mentioned by another of the experts in a report of April 23, 1981.

On May 21, 1981, Sunbury's counsel forwarded to all counsel a copy of Dr. Naeye's curriculum vitae, and on May 22, 1981, all counsel received four 5″ by 7″ prints of slides taken by Dr. Naeye of placental tissue. On June 4, 1981 defendant Sunbury filed supplemental answers to plaintiffs' first set of interrogatories listing witnesses and experts, including Dr. Naeye. On June 5, 1981, plaintiffs' counsel wrote to defendant Sunbury's counsel indicating opposition to Dr. Naeye testifying and stating that "if Judge Dowling permits him to testify, I intend to call Eugene Perrin, M.D., as a rebuttal witness." Dr. Perrin was not called. On June 8, 1981, defendant Sunbury's counsel provided Dr. Naeye's written response to sixteen questions and requests for other detailed information submitted by plaintiff's attorney in a letter dated May 29, 1981.

On June 9, 1981, defendant Sunbury's counsel forwarded to [the] Augustines' attorney a report of Dr. Naeye dated June 8, 1981, which contained the doctor's interpretation of data derived from the United States Collaborative Perinatal Project. On June 10, 1981, a pre-trial conference was held at which time plaintiffs' counsel asked that Dr. Naeye be prohibited from testifying... In order to allow the plaintiff further discovery, it was

*Klyman v. Southeastern Pennsylvania Transportation Authority*, (J. 2494/83, filed April 19, 1984), slip op. at 5.

**3.** Notwithstanding appellants' lengthy discussion of events from the filing of the complaint in March, 1977, to the spring of 1981, we believe it is unnecessary to address what occurred during that time, finding that any alleged surprise and prejudice to the preparation of appellants' case would have occurred since May, 1981.

ordered that defendants produce Dr. Naeye for deposition at a time when plaintiffs' counsel could have his expert pathologist present.... On the second day of trial, June 16, 1981, in the evening [plaintiffs' counsel] took the discovery deposition of Dr. Naeye at the Hershey Medical Center.

(Lower Court Opinion at 2–3).

█ Appellants' basic claim is that although they were aware of Dr. Naeye, they were, during the weeks prior to trial and throughout his actual testimony, subjected to and surprised by deviations in his theories and changes in his expert opinion. We have carefully reviewed the record, particularly focusing upon the period of time from appellants' counsel's awareness of Dr. Naeye through appellants' rebuttal of Dr. Naeye's testimony. Contrary to appellants' assertions, we are unable to conclude that Dr. Naeye's testimony unfairly prejudiced the preparation or presentation of appellants' case.

█ According to the lower court, Dr. Naeye testified during the last week of a four-week trial, approximately 50 days after appellants were first informed of his possible participation in the case. From May 21, 1981 through June 8, 1981, appellants were supplied with reports and slides from Dr. Naeye, as well as answers to sixteen questions specifically submitted by appellants' counsel.[4] In addition, on June 9, 1981, appellees' counsel[5] forwarded a third report containing Dr. Naeye's interpretation of data found in the U.S. Collaborative Perinatal Project. Although appel-

4. Appellants note that Dr. Naeye refused to let his unpublished scientific papers be reviewed. While this fact is somewhat disconcerting, in light of Dr. Emanuel Friedman's obvious expertise in this area, and his ability to effectively rebut Dr. Naeye's testimony, see opinion at 327–328, infra, and the amount of time appellants had to investigate Dr. Naeye's background and theory, we cannot find this fact alone—or even coupled with other allegations of prejudice—sufficient to require a new trial.

5. The use of the term "appellees' counsel" throughout this opinion is a reference to the different counsel for the several defendants. As noted in the text, defendant Delgado is the only actual appellee in the instant appeal.

lants' counsel preserved his continuing objection to Dr. Naeye's proposed testimony at this juncture, he failed to request a continuance to have additional time to study and develop a strategy to refute the testimony.[6] The lower court then provided appellants with the opportunity to depose Dr. Naeye, albeit two days into the trial. Depositions or other discovery techniques are permitted pursuant to Pa.R.Civ.P. 4003.5(a)(2), which provides:

> (2) Upon cause shown, the court may order further discovery by other means, subject to such restrictions as to scope and such provisions concerning fees and expenses as the court may deem appropriate.

We read the rather clear language of this subsection to indicate that the trial judge is (1) not required to permit additional discovery and (2) may only permit it, if at all, upon a showing of good cause. Accordingly, appellants' opportunity to depose Dr. Naeye is not to be considered routinely granted. Rather, in granting appellants this extremely beneficial opportunity to explore further Dr. Naeye's proposed testimony the lower court sought to protect appellants from unfair surprise and prejudice.

Continuing our review, we come next to Dr. Naeye's direct testimony, again, well-summarized by the court below:

> On direct examination, Dr. Naeye testified basically as to three matters. The first was that of water intoxification. This was a subject which was developed in detail by the plaintiffs' expert pathologist, Douglas R. Shanklin, M.D., who was on the stand over a three-day period. In essence, Dr. Naeye's testimony on this subject was in rebuttal to the testimony of Dr. Shanklin. The second category of Dr. Naeye's testimony concerned the effects of oxytocin and its potential for brain damage. This also

6. Appellants rely in part on Pa.R.Civ.P. 4007.4's requirement that a party has an obligation not only to supplement a discovery response as to the identity of an expert expected to testify, and the substance of his testimony, but also to amend seasonably a response if an initial answer is no longer true. Upon review of the pre-trial discovery relating to Dr. Naeye's subsequent testimony, we find that appellees' counsel acted properly and did not violate this rule.

had been discussed in detail by Dr. Shanklin and was a rebuttal of his conclusions. The third was a description of what he saw on the placental slides taken from the placenta in the birth of the Augustine twins. There were no surprises in this testimony as this matter had been fully revealed to plaintiffs' counsel in the information previously supplied in Dr. Naeye's deposition. Dr. Naeye was not asked, and did not express, an opinion as to the cause of the cerebral palsy in the twins.

(Lower Court Opinion at 4). Although appellants object to Dr. Naeye's being permitted to testify at all, their primary objection is to Dr. Naeye's response to a line of questioning on cross-examination where appellant's counsel and Dr. Naeye maintained the following dialogue:

Q Mr. Rettig [appellees' counsel] never asked you the question I am sure all of us would like to ask you. That is, some hypoxia does not mean the villous edema caused the brain damage that these babies have?

A No. But I feel that we certainly know what caused the brain damage.

Q You feel you certainly know?

A Uh-hum.

Q All right.

(N.T. July 13, 1981 at 86). Appellants' counsel then specifically asked Dr. Naeye to "tell us if you certainly know [what caused the brain damage]," (N.T. July 13, 1981 at 86), and Dr. Naeye explained his theory that Mrs. Augustine's low blood pressure was the primary cause of the twins' brain damage. (*Id.*) Appellants now claim prejudice and surprise arising from the fact that Dr. Naeye had testified in his deposition that he did not know the cause of the placental swelling (villous edema).[7] We agree with the lower court's observations, however, that, in asking Dr.

7. Issues not objected to in the lower court are usually considered waived on appeal. Pa.R.A.P. 302(a); *Dilliplaine v. Lehigh Valley Trust Co.,* 457 Pa. 255, 322 A.2d 114 (1974). Although appellants' counsel did not specifically object below to Dr. Naeye's answer on cross-exam-

Naeye about the cause of the brain damage, appellants' counsel ventured into "matters on which [Dr. Naeye] ha[d] not been interrogated in the discovery proceedings," Pa.R. Civ.P. 4003.5(c), and therefore should have been prepared for the response. Appellants' counsel may not, upon hindsight, aver that his question to Dr. Naeye at the deposition inferentially referred to the brain damage and not just to the cause of the edema.

Following the conclusion of Dr. Naeye's cross-examination, which appellants characterize as "trial by ambush", appellants again failed to request a continuance. The lower court did, however, permit appellants to present rebuttal testimony and granted appellants a weekend to prepare. To rebut Dr. Naeye's theory, appellants called Dr. Emanuel Friedman, whose videotaped testimony had been presented as part of appellants' case-in-chief. Appellants assert that this rebuttal was "too little, too late." We disagree. There are many instances in the record where Dr. Friedman directly rebutted Dr. Naeye's blood pressure theory. For example, after examining Dr. Friedman's credentials as a result of his years of study in the area of blood pressure and pregnancy, and his extensive work on the United States Perinatal Collaborative Project, appellants' counsel queried as follows:

Q Did you reach a conclusion that fluctuation or variation of blood pressure do not mean anything?

A That is entirely correct, sir.

Q So that if Dr. Naeye comes in there and he says that the drop in her blood pressure caused the brain damage, what is your opinion of that?

A *There is no evidence to support that conclusion, sir.*
(N.T. July 13, 1981 at 834) (emphasis added).

At another point in Dr. Friedman's rebuttal, the following occurred:

ination that appellants consider to be inconsistent with his deposition testimony, we will address the issue because appellants' counsel preserved his objection to Dr. Naeye's entire testimony throughout the trial and because the issue has been sufficiently briefed by both sides.

Q And Doctor, with regard to your book that you have in front of you, could we take just a few moments now to explain all of the different types of ramifications of blood pressure that you explored to find out whether sudden drops or sudden rises or consistently [sic] highs or drops for two weeks or drops for three months have any bearing at all?

A Yes sir.

. . . . .

Q In fact, would a sudden drop be an unusual phenomenon even of twenty points?

A Not at all.

(*Id.* at 841–42). *See also* N.T. July 13, 1981 at 853 (Dr. Friedman testifies that the literature does not support a finding that edema in the placenta is related to the health of the fetus); N.T. July 13, 1981 at 865 (Dr. Friedman states that Dr. Naeye's conclusion that the problem occurred when Mrs. Augustine's pressure dropped "is not based on factual material".). Based on these segments of the rebuttal testimony and read in the context of Dr. Friedman's entire testimony, appellants clearly had the opportunity to, and did, in fact, rebut Dr. Naeye's testimony. Hence, we concur in the trial court's determination that appellants had an excellent chance to cure any earlier prejudice.

In consideration of the appellate court cases discussed above, we conclude that the alleged prejudice in the instant case differs substantially from that demonstrated in the majority of those cases. Here, unlike the situations in *Sindler, Gill* and *Royster,* appellants commenced trial with full knowledge of Dr. Naeye's participation. Further, unlike the situations in *Bell* and *Starr,* appellants were given adequate reports, slides and an opportunity to depose orally the expert, Dr. Naeye. As in *Kemp,* appellant had time to investigate Dr. Naeye's theory and qualifications and the lower court accommodated appellants by ordering the deposition. Moreover, in the instant case, appellants could have sought a continuance at several stages of the trial and did not. Finally, in analyzing the events according to the

factors detailed in *Gill,* we conclude that appellants had the ability and opportunity to cure any prejudice or surprise and that appellees did not demonstrate such bad faith as to require the drastic sanction of precluding Dr. Naeye's testimony.

■ Appellants contend also that the lower court erred in excluding a portion of the deposition of one of their experts for trial. Specifically, appellants object to the lower court's refusal to permit the verbatim reading of Dr. Perkin's report. Upon appellees' objections, the lower court concluded that portions of the letter were irrelevant and prejudicial. Evidentiary rulings are clearly within the discretion of the trial court. Here, we find that the lower court did not abuse its discretion in concluding that portions of Dr. Perkins' letter were hearsay and in allowing only the relevant, informative portions of the letter to be read to the jury. *See Ulansey v. Juniata Park Medical Center, Inc.,* 406 Pa. 389, 178 A.2d 547 (1962).

■ Lastly, appellants challenge the lower court's allowing appellees' counsel to draw an adverse inference from appellants' failure to call two pediatric neurologists who had been involved with the twins' diagnosis and care. It is well-settled that "[s]o long as no liberties are taken with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present his case in the light most suited to advance his cause and win a verdict in the jury box." *Contractors Lumber and Supply Co. v. Quinette,* 386 Pa. 517, 522, 126 A.2d 442, 444 (1956). The record here reveals that both neurologists were actively involved in the twins' care prior to the lawsuit. Therefore, we agree with appellees that "it was certainly proper argument to point out the obvious fact that, although in an advantageous position to do so, (being pediatric neurologists) neither physician had presented any liability testimony in support of plaintiffs' theory." (Appellee's Brief at 41). Accordingly, we conclude that appellees' counsel, in pointing out this omission to the jury, did not take liberties

with the evidence but instead, made an appropriate comment in his closing argument.

Based upon the above analysis and disposition of appellants' claims, we affirm the lower court's denial of appellants' post-trial motion.

Affirmed.