## Clark v. Frankford Hospital

2

*Ronald L. Wolf* and *Gregory B. Heller,* for plaintiffs.
*John Filoreto* and *Anthony F. Zabicki Jr.,* for defendant
Frankford Hospital.

*Timothy R. Lawn,* for defendants Werthan and Neuro-surgical Associates.

*William H. Pugh V,* for defendant Shawaluk.

GOLDMAN *J.,* June 7, 1996—This case involves allegations of medical malpractice arising from the claim of plaintiff Francis J. Clark M.D. and his wife Alison Clark that defendants Frankford Hospital—Torresdale Division and various defendant doctors failed to ad-minister proper care to Francis Clark in the hospital's emergency room when he presented there complaining of vision problems after sustaining a blow to his left cheek. Plaintiff alleged that undiagnosed retinal tears at that time resulted in eventual retinal detachments in both of his eyes, requiring a series of surgical and other treatments, and leaving him with vision defects that destroyed his plans to become an oculoplastic sur-geon. Defendants denied that their treatment of plaintiff departed from the proper standard of care and further argued that plaintiff's retinal detachments were probably caused by factors linked to his extreme myopia and an inherited eye condition, rather than the blow to his face.

The record discloses these facts: On October 18, 1987, plaintiff Francis Clark competed in a running-race spon-sored by Frankford Hospital. During an altercation im-mediately after the race, he was struck in the left cheek and knocked to the ground by another race participant. Accompanied by friends, plaintiff walked to the nearby Frankford Hospital emergency room, complaining of trouble seeing out of his left eye and double vision. Plaintiff was examined there by several physicians, in-cluding defendant David Cionni M.D., an emergency medicine doctor; defendant Christine Obermesser M.D., a trauma surgeon; and defendant Merylee Werthan M.D., a neurosurgeon. By the time he saw Dr. Werthan, plain-

tiff's double vision had "dramatically improved" and his blurred vision was improving as well. N.T. 438. In the course of her examination of plaintiff, defendant Werthan examined plaintiff with an ophthalmoscope and consulted, by telephone, with the hospital's on-call ophthalmologist, defendant Paul Shawaluk M.D.[1]

Following defendant Werthan's examination, plaintiff left the emergency room. At the time of these events of October 1987, plaintiff, a 1986 graduate of Thomas Jefferson University Medical School, had completed a year-long medical internship and was working as a house physician at Delaware County Memorial Hospital, and was scheduled to begin a residency in ophthalmology at Vanderbilt University in Tennessee in July 1988.

Plaintiff testified that in late September 1989, while at Vanderbilt, he noticed "floaters" in the vision of his right eye, leading him to see a local ophthalmologist on November 6, 1989, who diagnosed a detached retina in that eye, requiring immediate attention. The next day, plaintiff underwent surgery on the eye (a scleral buckling procedure) at Wills Eye Hospital in Philadelphia, performed by Dr. Gary Brown, a retina spe-

---

1. Under an agency theory, plaintiff also joined as defendant Neurosurgical Associates, with whom defendant Dr. Werthan was associated. Frankford Hospital was joined under a theory of ostensible agency liability, since the hospital employed defendant Shawaluk as a private contractor. Defendants David Cionni M.D., Gail Rudnitsky M.D., and Medical College of Pennsylvania were originally named as defendants, but were dismissed with prejudice during the course of the trial when the court granted these defendants' motion for non-suit, following plaintiff's failure to produce any expert testimony to support a claim of negligence against them. Thus the interrogatories presented to the jury at the close of testimony and the final verdict involved only defendants Werthan, Neurosurgical Associates, Shawaluk, and Frankford Hospital.

cialist. After the surgery, plaintiff learned that his left eye also required treatment for a detached retina. Plaintiff later had further surgery on the right eye and a laser procedure on the left to treat the bilateral detachments. He claimed that the double vision and focusing problems that resulted from the multiple procedures on his eyes terminated his long-held plans to become an oculoplastic surgeon, thus leading to his loss of lifetime earnings, although he presently practices as a general ophthalmologist and can perform "gross" ophthalmic surgery. N.T. 479-81.

The case revolved around disputed facts on the issue of whether defendant Werthan followed the applicable standard of care in treating plaintiff during the examination in the Frankford Hospital emergency room. At trial plaintiff and defendant offered conflicting accounts of that examination. Plaintiff testified that defendant Werthan allowed him to leave the hospital without properly insisting either that he be seen immediately by an ophthalmologist, or that he be admitted to the hospital for observation. His testimony is that Dr. Werthan told him that there was no need for the on-call ophthalmologist to come in and see him, and that she merely told him that if his vision got worse he could follow up with the ophthalmologist at the hospital where he worked as a house physician. Defendant Werthan, for her part, testified that plaintiff insisted that he did not want to stay in the Frankford emergency room and, instead, he was eager to leave. She stated that she conferred with the on-call ophthalmologist defendant Dr. Shawaluk by phone, and that he opined that plaintiff could leave Frankford Hospital and go to the ophthalmologist of his choice for follow- through. She states that she offered plaintiff the option of admission to Frankford for later evaluation by an ophthalmologist

or the option of being seen at his own hospital. Evidence at trial showed that defendant's hospital record of that examination included the notation that "patient will be seen by ophthalmologist Del. Valley Hosp. (I spoke to Dr. Shawaluk, eye). To be followed Del. Valley. Contact me if any problems—re head injury." Plaintiff's exhibit, P-16. N.T. 183-85.

Jury trial began on September 8, 1995. Jury deliberations began on September 19, and concluded on September 22. In response to special interrogatories, the jury found that defendants Werthan and Shawaluk were not negligent. Plaintiff filed post-trial motions seeking a new trial on the grounds that: (1) defendant Shawaluk's counsel improperly argued to the jury that plaintiff's expert's report was written on the letterhead of plaintiff counsel's law firm, thereby impugning the credibility of that expert; (2) counsel for defendant Shawaluk improperly argued that the jury could make an adverse inference from plaintiff's failure to call certain physicians as witnesses and to ask certain questions of plaintiff's treating physician who did testify, and the court failed to provide a specific curative instruction; (3) the court failed to instruct the jury on circumstantial evidence and concurrent causes as requested in plaintiff's pretrial submitted points for charge; (4) the jury's verdict was contrary to the evidence and contrary to the weight of the evidence; (5) the court erroneously refused to permit plaintiff's expert to refer to the records of another physician who did not testify at trial; and (6) during voir dire, the court erroneously refused to strike a particular juror for cause despite her display of anti-plaintiff bias.[2] For the reasons discussed below, plaintiff's post-trial motions were denied.

---

2. Plaintiff later withdrew this argument from his post-trial motion and brief, noting that the juror was properly withdrawn for hardship reasons. Plaintiff letter to court April 4, 1996.

## I. DEFENSE COUNSEL'S CLOSING ARGUMENT REGARDING EXPERT'S REPORT

Plaintiff contends that defendant Shawaluk's counsel made an improper and factually inaccurate argument in his closing remarks to the jury when he argued that plaintiff's expert, Dr. Mausolf, had submitted his pretrial report on the "stationery of plaintiff's lawyer." According to plaintiff, this falsely created the impression for the jury that plaintiff's lawyer had authored the report. At trial, plaintiff's counsel objected, and explained to the judge at a sidebar conference that he, plaintiff's counsel, had submitted the content of the expert's anticipated testimony in the form of answers to expert witness interrogatories on the firm's pleading paper, signed by the expert, in compliance with one of the permissible methods for pretrial discovery of expert opinions under Pa.R.C.P. 4003.5. N.T. 1024-26. Plaintiff again contends post-trial that the form of its pretrial submission of Dr. Mausolf's opinions accorded with the sections of the rule stating that:

"a party *may through interrogatories* require . . . the other party to have each expert so identified by him state that substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. *The party answering the interrogatories may file as his answer a report of the expert or have the interrogatories answered by his expert. The answer or separate report shall be signed by the expert.*" Pa.R.C.P. 4003.5(a)(1)(b). (emphasis added)

Plaintiff's counsel asked the court for a cautionary instruction to tell the jury that "it is perfectly proper to tell the defendants the opinion of the experts" in the manner done here. The court sustained plaintiff's

objection and instructed defendant Shawaluk's counsel to explain the matter to the jury. In response to the court's instruction, the defendant's counsel said:

"The judge wants me to tell you, ladies and gentlemen, that over the course of this litigation, the plaintiff has been served with various requests for information, and that response by Matusow (plaintiff's counsel) that I just represented was a response to information that defendants had requested. I didn't mean to infer that there's anything improper. I just wanted to tell you that that was the document that was provided to us and he testified to." N.T. 1025-26.

Plaintiff now argues that this statement was not sufficiently curative since it did not explain that the discovery rules permitted counsel to prepare answers in response to the expert interrogatories submitted by defendant and thus the statement did not dispel the false and prejudicial impression that plaintiff's lawyers somehow collaborated with the expert in formulating the opinion testimony.

Defendant responds that, in fact, plaintiff expert Dr. Mausolf's testimony at trial supported the argument that plaintiff's counsel was an active participant in preparing the expert's report. In response to questioning on cross-examination, Dr. Mausolf testified that the first time he provided expert opinions was in response to interrogatories on plaintiff's counsel's paper. Dr. Mausolf explained that "we discussed over the phone the issues and then he (counsel) sent me a rough draft and he had me work on it and mail it back to him." N.T. 325. He added: "[a]s I said we did write some of it, so I don't know what we wrote and what they wrote but the opinion is all mine." N.T. 326. Defendant argues that the only potential inaccuracy in the closing arguments—that plaintiff's expert's report was written

on the lawyer's stationery—was sufficiently clarified by the curative statement that he gave, immediately following the court's instruction, and prefaced with the words "the judge wants me to tell you . . ." thus lending the court's curative authority to the statement. We agree with defendant's arguments.

Preliminarily, we note that the resolution of whether or not remarks made by counsel in an argument to the jury warrant a new trial require a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect. *Miller v. Kriner,* 341 Pa. Super. 293, 301, 491 A.2d 270, 274 (1985). Here, we reviewed the record, and our assessment of the circumstances and the precautionary measures taken convinced us that no prejudice to plaintiff resulted from the closing remarks by defendant's counsel described above.

As Dr. Mausolf himself testified, and as plaintiff's exhibits indicate, the expert's opinions were relayed in two separate forms and on two separate occasions. First, as noted earlier, plaintiff's counsel submitted answers to expert witness interrogatories to defendants on July 14, 1993 in the form of a pleading, on paper captioned with the name of plaintiff's counsel's law firm, and co-signed by plaintiff's attorney and the expert. These answers speak of Dr. Mausolf in the third person and focus primarily on a detailed narrative reviewing the alleged events that took place in the Frankford Hospital emergency room on October 18, 1987. As defendant argues, Dr. Mausolf conceded at trial that he discussed his opinions with counsel over the phone, and cannot say for sure "what we wrote and what they wrote, although the opinion is all mine." N.T. 326.

Thus, there was some evidence as to confusion in regard to who contributed to the contents of the submission in question, weakening plaintiff's assurances that the form of this answer complied with the permissible options set forth in Rule 4003.5: Plaintiff's answers to interrogatories contained neither "a report of the expert" nor are the "interrogatories answered by [the] expert" alone. See Pa.R.C.P. 4003.5(a)(1)(b).

Second, plaintiff's counsel later submitted a pretrial written report by Dr. Mausolf, dated January 26, 1995, describing his "second opinion" examination of plaintiff performed at the request of plaintiff's counsel. This report was written on the stationery of Dr. Mausolf's company, Ophthalmic Legal and Educational Services, and spoke only of the results of that single eye exam. Thus, defendant was not entirely inaccurate when he referred in his closing arguments to a report written on the stationery of the expert. In any event, the court's instruction to defendant's counsel to explain his remark to the jury, with which counsel complied immediately, sufficiently addressed the alleged inference that plaintiff's counsel improperly participated in authoring his client's expert's testimony. For the same reasons, the court properly rejected plaintiff's request for an additional specific charge to the jury instructing that the rules of discovery permit an attorney to submit answers to expert interrogatories.

Further, the court adequately covered any of plaintiff's lingering concerns regarding the potential adverse impact of the closing statement on Dr. Mausolf's testimony by giving the standard instruction, no. 5.30, regarding the weight to be given to an expert's opinion. A new trial on the grounds of inadequacy of the charge is not warranted unless there is prejudicial omission of something basic or fundamental. *Stewart v. Motts,* 539

Pa. 596, 606, 654 A.2d 535, 540 (1995). No such prejudice occurred here. Thus, plaintiff's motion for a new trial on these grounds was denied.

## II. CLOSING ARGUMENTS REGARDING ADVERSE INFERENCE FROM MISSING WITNESSES/TESTIMONY

Plaintiff contends that counsel for defendant Dr. Shawaluk improperly introduced an "adverse inference" argument in his closing arguments to the jury when he argued that plaintiffs had not presented any retina specialists to testify at trial on their behalf. Plaintiff is referring to his objection at trial following these remarks by defendant's counsel to the jury:

"Who is a retina specialist who has walked through this case? I will tell you who they are. First and foremost, Dr. Brown. Dr. Brown is a world-renowned retina specialist and he testified as to what he did. . . . Dr. Brown didn't say that the trauma caused the detachments . . . Dr. Brown's partner, Dr. William Tasman, another world-renowned retina specialist, participated in the surgeries. You didn't hear anything about him, did you? He's not in here telling you that it is related to trauma." N.T. 1026-27.

Plaintiff complains that the court erred in permitting defendant's counsel to argue that "the best plaintiff could do" was bring in as their only expert a general ophthalmologist, Dr. Mausolf, although the case "cries out for expert testimony by a retinal specialist." N.T. 1026. Plaintiffs objected that the adverse inference to missing witnesses was improper since such witnesses were available to both sides. Defendant responded that he was not asking for an adverse inference but was "just telling the jury who's here and who's not." The court overruled plaintiff's objection and defendant continued to enu-

12

merate the retina specialists who had treated plaintiff—
Dr. Lincoff of New York, and Dr. Femen at Vander-
bilt—but who had not testified at trial. N.T. 1027. In
contrast, defendant argued to the jury, defendant's ex-
pert, Dr. Deglin was a retina specialist and had opined
that lattice degeneration, an inherited condition, and
myopia had caused the plaintiff's bilateral detachments.

Plaintiffs again argue post-trial that an adverse in-
ference should not have been allowed in this case be-
cause the rule is that an adverse inference cannot be
drawn from a party's failure to call a witness if the
witness is equally available to both sides. Here, argues
plaintiff, the enumerated doctors were equally accessible
to both sides in the litigation. Defendants respond that
the inference was justified, since although the missing
witnesses were known to both sides, they were not
equally available to defendants: they were plaintiff's
*treating* doctors, and defendants were not allowed equal
access to them under discovery rule Pa.R.C.P. 4003.6.[3]
Defendant Werthan's brief at 10, defendant Shawaluk's
brief at 12.

In addition to voicing an objection during the closing
argument, plaintiff's counsel later requested the court
to specifically instruct the jury not to take any adverse
inference from the fact that plaintiff "didn't parade in
every doctor who had some contact with this plaintiff."
N.T. 1051. The court rejected plaintiff's request, but
assured counsel that it would give the standard charge
instructing the jury not to draw any inference from
the relative number of witnesses proffered by the parties.
That is, while the court allowed defendant's counsel

3. Pa.R.C.P. 4003.6 states that "information may be obtained from
the treating physician of a party only upon written consent of that
party . . . ."

to argue the matter of plaintiff's absent witnesses and missing testimony to the jury, the court properly did not *instruct* the jury that it should draw or fail to draw any adverse inference. Accordingly, we were not presented, post-trial, with the issue of an improper adverse inference *instruction:* Defendants did not request the court to give the jury any such instruction. Rather, it was plaintiff who requested the judge to instruct the jury *not* to take adverse inference from plaintiff's failure to produce certain treating physicians-witnesses and testimony. The court merely allowed defendant Shawaluk's counsel to remark in closing arguments on a central feature of his claim—that plaintiff failed to prove the essential element of causation. Thus our analysis of plaintiff's post-trial allegations pertaining to the adverse inference issue focused only on the propriety of any negative inference made by counsel in his closing remarks, without any need for us to reach the separate issue of adverse inference instruction. Our review of the record led us to determine that the court properly allowed defendant's closing arguments.

We note that, regarding the proper content of counsel's closing remarks, "[s]o long as no liberties are taken with the evidence, a lawyer is free to draw such inferences as he wishes from the testimony and to present [the] case in the light most suited to advance his cause and win a verdict in the jury box." *Augustine by Augustine v. Delgado,* 332 Pa. Super. 194, 210, 481 A.2d 319, 327 (1984). In *Augustine,* the court allowed defendant's counsel to draw a negative inference from appellant's failure to call two pediatric neurologists who had treated plaintiffs-twins. The court found that since both neurologists had been actively involved with the twins' diagnosis and care prior to the suit, "it was certainly proper argument [for defendant's counsel] to point

out the obvious fact that, although in an advantageous position to do so (being pediatric neurologists) neither physician had presented any liability testimony in support of plaintiffs' theory." *Id.* The court concluded that in pointing out the omission to the jury, counsel "did not take liberties with the evidence but instead, made an appropriate comment in his closing argument[s]." *Id.*

Similarly, here, the trial court found that the defendant's counsel's closing arguments at issue were proper because they referred to evidence presented at trial for the purpose of advancing defendant's case before the jury in regard to causation. At trial, plaintiffs had presented a sole expert, general ophthalmologist Dr. Mausolf, who stated that the retina detachments were directly caused by the 1987 blow to the left cheek sustained by plaintiff. In contrast, defendants had presented their expert Dr. Deglin, a retina specialist, who opined that the detachment in the right eye was caused by "shrinkage of the vitreous gel" and in the left eye by an inherited condition suffered by plaintiff called "lattice degeneration," a thinning of the retina, described in plaintiff's Wills Eye Hospital records. Deglin deposition at 26. Dr. Deglin further opined that a direct hit to the left eye "would not be expected to cause a tear in the opposite eye." Deglin deposition at 27. The record further indicates that plaintiff, during his preceding closing to the jury, had attacked the expert opinion of Dr. Deglin.

Based on the testimony at trial, it was expected and reasonable for defendant's counsel to argue to the jury in his closing remarks to them that plaintiff's expert was a general ophthalmologist while defendant's expert was a retina specialist, in order to contrast the qualifications of the respective experts to opine regarding

causation in this case. Further, counsel could justifiably identify the "missing" retina specialists as Drs. Lincoff, Femen and Tasman and could properly refer to Dr. Brown's omitted causation testimony as well. Testimony had been offered at trial that these doctors had treated plaintiff and were thus, arguably, in an advantageous position to offer opinion testimony regarding causation if called to testify. Plaintiff Dr. Clark testified that he consulted Dr. Femen, a retina specialist, in 1989, upon first noting the "floater" in his right eye. N.T. 454. He was also seen by "several retinal specialists at Wills" and by retina specialist Dr. Lincoff in New York. N.T. 462. Finally, another retinal specialist was Dr. Tasman, the partner of Dr. Brown who performed the scleral buckling retina surgeries. Dr. Brown himself, who had performed the surgeries and who was plaintiff's primary treating doctor did testify, but did not state the cause of the detachments. Dr. Mausolf, the expert, had linked the detachments to the facial blow. On the other hand, defendant's expert, Dr. Deglin, had "served two retina fellowships" (N.T. 1024) and he testified that the de-tachments were related to lattice degeneration. Further, plaintiff's counsel had forcefully attacked the credibility of Dr. Deglin in his own closing remarks. Since the case largely revolved around conflicting expert testi-mony about the cause of plaintiff's bilateral retina de-tachments, defendant's counsel could justifiably and reasonably point to the allegedly superior qualifications of his expert in this area of medicine and to point out that plaintiff's only expert was not a retina specialist, and to enumerate the tearing retina specialists who had not testified for plaintiff, thereby inferring that their absence meant that they would not have been able to support plaintiff's causation theory if they had been called as witnesses. See 77 A.L.R. 4th, 463, 478-95,

*Annotation; Adverse Presumption or Inference Based Upon Party's Failure To Produce or Question Examining Doctor—Modern Cases* (noting that in medical malpractice cases, adverse inference charge from injured parties' failure to call a treating physician is justified where physician was under plaintiff's "control" and apparently held good will toward plaintiff so that he is in a position to give evidence that is substantial and not merely cumulative, and where patient made no attempt to demonstrate witness unavailability or unwillingness to testify on his behalf).

Thus, defendant's counsel's references to these "missing" witnesses and testimony was appropriate during his closing comments, requiring no curative instruction from the court, and plaintiff's motion on this issue was denied.

## III. JURY CHARGES

Plaintiffs contend that the court erroneously failed to instruct the jury to consider circumstantial evidence in this case. Such a charge was applicable, argue plaintiffs, because the case turned on a central factual dispute: whether or not defendant Dr. Werthan told plaintiff Dr. Clark that he needed a complete ophthalmologic examination, and circumstantial evidence supported Dr. Clark's version of events. Plaintiff's brief at 28. Plaintiffs note that their pretrial submission to the court had included a proposed point for charge, defining circumstantial evidence as "such fair and reasonable inferences as properly flow from the facts which are not disputed or which you believe to be true." (Plaintiff's proposed point for charge no. 3.)

Next, plaintiffs argue that the court erred in failing to instruct the jury using plaintiffs' pretrial submitted points for charge on concurrent causation. Concurrent

causation charges were "significant" in this case because plaintiffs' "entire case involved retinal tears and detachments that had been precipitated by a third party's assault," while the jury had also heard that Dr. Clark's myopia and lattice degeneration may have caused the detachments and placed him at higher risk for detachments. Plaintiff's brief at 30. Plaintiffs had submitted three proposed points on concurrent cause. Pennsylvania standard charges nos. 3.26, 3.27, and 6.30. We are not persuaded by plaintiffs' arguments.

At the outset, we note that our review of the record discloses that plaintiffs did not raise objections regarding these specific jury charges, although they were afforded ample opportunity to do so by the court.

In conference with counsel for all parties at the close of testimony, the court stated:

"It is my practice to take exceptions to the charge after I charge. However, I'll answer any questions you might have about the charge, and to the extent it will affect your closing arguments, I will give you the position that I have. The points are the standard points. That's what I charge from . . ." N.T. 923.

In the ensuing discussion, plaintiffs' counsel did not request that the court charge the jury on either circumstantial evidence or concurrent causation. Further, the next morning in chambers, before delivering closing arguments to the jury, plaintiffs' counsel specifically asked the court to instruct the jury on permitted methods of answering expert interrogatories, and on adverse inference, but made no request for a charge on circumstantial evidence or concurrent causation. Finally, after all counsel had delivered their closing arguments and the court charged the jury, the court, as promised, invited counsel to voice any objections to the charges or to request additional charges. Plaintiff's sole exception

was to request the court to instruct the jury on plaintiff's "loss of economic horizons." N.T. 1072.

The issue of these omitted jury charges was thus waived by plaintiffs' failure to raise appropriate objections at trial, despite inclusion of the points among their pretrial submissions. "If no objection is made, error which could have been corrected in pretrial proceedings or during trial by timely objection may not constitute a ground for post-trial relief." Note to Pa.R.C.P. 227.1(b)(1). The reason why grounds for post-trial relief must be raised before or during trial stems from practical considerations: "[r]equiring a timely specific objection to be taken in the trial court will ensure that the trial judge has a chance to correct the alleged trial errors. *Dilliplaine v. Lehigh Valley Trust Company*, 457 Pa. Super. 255, 258, 322 A.2d 114, 116 (1974). This opportunity to correct alleged errors during trial advances the orderly and efficient use of judicial resources. *Id.* See also, *Pagesh v. Ucman*, 403 Pa. Super. 549, 552, 589 A.2d 747, 748 (1991) ("the law is clear that any objections to jury charge must be lodged at trial and on the record"). See also, *Cipriani v. Sun Pipe Line Company*, 393 Pa. Super. 471, 480, 574 A.2d 706, 711 (1990) (under Pa.R.C.P. 227.1, errors which could have been corrected during trial by timely objection cannot constitute grounds for post-trial relief), *allocatur denied*, 527 Pa. 661, 593 A.2d 843 (1991).

Finally, we point out that although the court did not use plaintiffs' submitted points for charge on concurrent cause, the jury was adequately and accurately instructed as to legal causation. The court instructed the jury from Pennsylvania Standard Instruction no. 10.03B pertaining to legal cause applicable to doctors, containing language instructing the jury on applicable principles of causation in a malpractice case, such as the instant

case, in which evidence was presented that multiple factors may have contributed to plaintiff's injuries. Using the standard language, the court appropriately instructed on the "substantial factor" and "increased risk of harm" principles of causation. N.T. 1061-62. Accordingly, plaintiffs were not prejudiced by the trial court's divergence from the precise language requested, see *Cooper v. Burns,* 376 Pa. Super 276, 283, 545 A.2d 935, 938 (1988), *allocatur denied,* 522 Pa. 619, 563 A.2d 888 (1989), and plaintiff's post-trial motions on these issues were denied.

## IV. PRECLUSION OF REFERENCE TO NON-TESTIFYING DOCTOR'S REPORT

Plaintiff next contends that the court erred in refusing to permit his expert, Dr. Mausolf, to refer during his testimony at trial to the office record of Dr. Lincoff, a retina specialist in New York who examined plaintiff late in November 1989, after his initial surgery at Wills. Plaintiff attempted to question Dr. Mausolf about the cause of plaintiff's retina detachment, referring to the Lincoff record. The court sustained defendant's objection to this reference on the ground that the out-of-court opinion of the non-testifying doctor, Lincoff, was hearsay, and instructed the jury to disregard any reference to Dr. Lincoff or any conclusions he may have drawn. Plaintiffs now contend that the court's ruling was erroneous, citing the exception which allows an expert to testify in court to such out-of-court records when they are of the sort that the witness would normally rely on in formulating his expert opinion. We disagree.

We agree that under the exception to hearsay established in *Commonwealth v. Thomas,* 444 Pa. 436, 445, 282 A.2d 693, 698 (1971), and its progeny, medical experts are permitted to express opinions, which are

based, in part, upon reports which are not in evidence, reported by other medical personnel who are not called at trial, if such reports are customarily relied upon by experts in the profession. *Rafter v. Raymark Industries Inc.,* 429 Pa. Super. 360, 365, 632 A.2d 897, 900 (1993). However, the expert witness may not use the opinion to merely bolster or corroborate his or her own medical opinion or diagnosis. *Cooper v. Burns, supra* at 288, 545 A.2d at 941. In *Cooper,* the court held that the plaintiff's witness, his treating-doctor, could base his testimony on a psychiatrist's report which he had used in treating the patient, but could not testify concerning another treating physician's diagnosis which was the *same as his but on which he did not rely. Id.* at 286-87, 545 A.2d at 940. The court noted that the first instance was permissible since the treating physician, a surgeon, had asked the psychiatrist for a consultation and had used the psychiatric diagnosis in treating the plaintiff. *Id.* The latter instance, however, was hearsay, since it was in the nature of a "second opinion" which merely buttressed, confirmed or corroborated the testimony of the in-court testifying physician. *Id.* at 287, 545 A.2d at 941. Stated differently, the expert must not act as "a mere conduit or transmitter of the content of an extrajudicial source." *Primavera v. Celotex Corporation,* 415 Pa. Super. 41, 52, 608 A.2d 515, 521 (1992), *allocatur denied sub nom. Celotex Corporation v. Primavera,* 533 Pa. 641, 622 A.2d 1374 (1993). "An 'expert' must not be permitted simply to repeat another's opinion or data without bringing to bear on it his own expertise and judgment. Obviously, in such a situation, the non-testifying [doctor] is not on the witness stand and truly is unavailable for cross-examination." *Id.* Further, the crucial point is that the fact-finder be made aware of the bases for the expert's ultimate conclusions,

including his partial reliance on indirect sources. This also allows the adverse party to present its own countervailing facts and/or experts in response. *Id.*

In short, to fit the *Thomas* exception, the testifying physician must utilize the report of the other expert as partial support and aid in arriving at and explaining the basis of his own opinion. *Id.* at 52, 608 A.2d at 522. See *Packel & Poulin,* section 703 (factual basis for expert opinion testimony), at 515-18 (West, 1987 & Supp. 1995) (expert must not merely transmit report of another).

Here, the court properly determined that the *Thomas* exception was inapplicable, since there was no indication that Dr. Mausolf, plaintiff's only expert, actually relied upon the records of Dr. Lincoff, or consulted with Dr. Lincoff, or in any manner *used* that information, in formulating his own opinion that the 1987 blow to plaintiff's left cheek had caused his subsequent retinal detachments. See *Primavera, supra* at 52, 608 A.2d at 520, and 56 n.10, 608 A.2d at 523 n.10. As discussed earlier, the record discloses that plaintiffs submitted two pretrial reports regarding Dr. Mausolf's opinion in advance of trial, the first in the form of answers to expert witness interrogatories, submitted on July 14, 1993, the second in Dr. Mausolf's written report dated January 26, 1995. Neither of these submissions makes any mention of Dr. Lincoff or of his opinions. Although Dr. Mausolf stated, in response to counsel's questions, that he "knew of" Dr. Lincoff, that is not akin to reliance upon Lincoff's opinion as required by the *Thomas* exception. N.T. 304. Thus, plaintiff's reference to Dr. Lincoff was in the nature of corroborative evidence to merely confirm the expert's opinion and the court properly precluded the reference. Accordingly, plaintiff's motion on these grounds was denied.

## V. VERDICT CONTRARY TO
## EVIDENCE/WEIGHT OF EVIDENCE

Plaintiff's final contention is that the verdict was against the evidence and weight of the evidence because "plaintiff's version of events was confirmed by the testimony of several witnesses and by overwhelming common sense." Plaintiff's brief at 34. We find this argument meritless.

It is true that the evidence conflicted in this case. But a new trial is not warranted merely because the evidence conflicts and the jury could have decided for either party. *Whyte v. Robinson,* 421 Pa. Super. 33, 38, 617 A.2d 380, 382 (1992). Rather, it is proper to grant a new trial on grounds that a verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is thus imperative so that right may be given another opportunity to prevail. *Nudelman v. Gilbride,* 436 Pa. Super. 44, 50, 647 A.2d 233, 236 (1994); see also, *Cree v. Horn,* 372 Pa. Super. 296, 305, 539 A.2d 446, 448 (1988). Here, both sides were given ample opportunity to present their respective cases with numerous witnesses, expert testimony and relevant hospital records. In particular both sides used the Frankford Hospital emergency room chart of October 18, 1987. The chart contained, inter alia, Dr. Werthan's notation that plaintiff "will be seen by ophthalmologist Del. Valley Hosp." The court fully charged the jury on the legal standard by which to evaluate the testimony (N.T. 1055) and on the applicable burden of proof in a civil case. The jury deliberated from September 19 to September 22, and requested, at one point, to see the Frankford Hospital chart, which they were shown. Verdict was reached on September 22 for de-

fendants. Obviously, the jury did not believe that the plaintiff had sustained his burden. The veracity and credibility of the witnesses is for the jury to determine. *Musumeci v. Penn's Landing Corporation,* 433 Pa. Super. 146, 152, 640 A.2d 416, 420 (1994), *allocatur denied sub nom, Musemeci v. Penn's Landing Corporation,* 539 Pa. 653, 651 A.2d 540 (1994). In light of the testimony and other evidence, there was ample evidence from which the jury could reasonably have concluded that defendants' version of events was more believable, and that defendants thus properly treated plaintiff in Frankford Hospital's emergency room. Our review of the record persuades us that the verdict was supported by sufficient evidence and that the jury's finding, arrived at after lengthy deliberation, should not be vacated. Consequently, plaintiff's motion for a new trial on this basis was denied.