451 A.2d 499

**Barbara STARR, Appellant**

v.

**ALLEGHENY GENERAL HOSPITAL, Jan W. Maratta and Laibe A. Kessler.**

Superior Court of Pennsylvania.

Argued Oct. 13, 1981.

Filed Oct. 1, 1982.

Petition for Allowance of Appeal Denied Feb. 23, 1983.

---

216

218

Joseph D. Shein, Philadelphia, for appellant.

Gilbert S. Solomon, Pittsburgh, for Allegheny General, appellee.

David H. Trushel, Pittsburgh, for Kessler, appellee.

Before HESTER, JOHNSON and MONTEMURO, JJ.

MONTEMURO, Judge:

This is an appeal from an order of the Court of Common Pleas of Allegheny County denying appellant's motion for a new trial. The facts in the instant case can be summarized as follows:

On July 19, 1973, appellant, Barbara Starr, was struck in the head with a glass bowl thrown by her husband. She was rushed to Sewickley Valley Hospital where she received emergency treatment. While in the emergency room, appellant suffered a grand mal seizure, losing consciousness. Following her recovery from the seizure, appellant was transferred to Allegheny General Hospital where she was placed under the care of Doctor Laibe A. Kessler and Doctor Jan W. Maratta. Appellant was diagnosed as suffering from a depressed skull fracture and following various medical tests and examinations, Dr. Kessler recommended corrective surgery to elevate the depressed fracture. Appellant agreed to the operation. The surgery was performed and appellant was placed in post-operative care. Appellant, sometime thereafter during her post-operative treatment at Allegheny General Hospital, developed blurred vision, slurred speech and experienced difficulty in coordinating her bodily movements. Appellant filed suit against Allegheny General Hospital, Dr. Kessler and Dr. Maratta alleging that

injury to her cerebellum was the cause for her permanent partial incapacitation which resulted from the negligent post-operative treatment she received while under their care.

The case was tried before a jury which returned a verdict in favor of all the defendants below (appellees herein). Appellant's motion for a new trial was denied and she has taken this appeal from that order. For the reasons stated below, we affirm the order of the lower court.

Appellant's first contention is that the lower court erred in permitting a deputy court clerk to read the voir dire questions. Appellant refers to this procedure as "antiquated", "archaic and blatently erroneous" which destroys "the very essence of the voir dire examination." The essence of voir dire, in appellant's view, is that someone "learned in the law" must conduct the examination before it can be found that the procedure does not violate due process. Appellant cites no authority for this proposition.

The purpose of the voir dire examination is to secure a competent, fair, impartial and unprejudiced jury. *Commonwealth v. Christian,* 480 Pa. 131, 389 A.2d 545 (1978); *Commonwealth v. Short,* 278 Pa.Super. 581, 420 A.2d 694 (1980); *Commonwealth v. Fulton,* 271 Pa.Super. 430, 413 A.2d 742 (1979). To achieve this goal the trial judge has broad discretion in determining the scope, manner and procedure of the voir dire examination, and his decisions will not be reversed in the absence of palpable error. *Bentivoglio v. Ralston,* 477 Pa. 24, 288 A.2d 745 (1972); *Commonwealth v. Hoffman,* 263 Pa.Super. 442, 398 A.2d 658 (1979); *Commonwealth v. Cephas,* 213 Pa.Super. 278, 247 A.2d 662 (1968).

Appellant does not argue that this procedure deprived her of the opportunity to ask certain questions or that the procedure caused a partial and prejudiced jury to be impaneled. Rather, appellant contends that a deputy clerk, reading questions approved by the court, is, in and of itself, inherently prejudicial. While the procedure employed in

this case may not be the most judicious way to conduct a voir dire examination, we do not believe it to be violative of due process or an abuse of discretion by the trial judge. The court determined here what questions were to be asked and appellant was free to submit inquiries for the court's approval. Further, the court was available during the examination to rule on any objection raised by the parties. Since the scope of voir dire was structured by the court, the actual reading of the questions was but a ministerial act which did not impede the capacity of the examination to ferret out potential jurors incapable of rendering an impartial decision. We find, therefore, that the lower court did not abuse its discretion in permitting a deputy court clerk to read the voir dire questions to the veniremen.

Appellant's second contention is that the lower court erred in refusing to include in the voir dire examination two of appellant's proposed questions pertaining to possible jury bias. The questions denied were as follows:

11. Would any of you if you were otherwise satisfied under the evidence and by the charge of the Court that there was negligence on the part of one or more defendants in the present action which caused or substantially contributed to plaintiff's injuries, hesitate to find a verdict and award damages against such defendant either because he is a physician or it is a hospital?

12. Do any of you have any feelings or beliefs whatsoever concerning the propriety of bringing a malpractice action against a physician or hospital?

Although a juror's possible prejudice or bias concerning malpractice actions against physicians or hospitals is a relevant consideration which could affect a particular juror's impartiality, the specific inquiries proposed by appellant in this case were rather ambiguously phrased. While questions of a general nature are the preferred mode of conducting voir dire, inquiring as to a juror's "feelings or beliefs ... concerning the propriety of bringing a malpractice action" or whether a juror would "hesitate" to find against a

physician or hospital if the evidence established negligence on their part do not necessarily call for responses indicating a juror's fixed opinion in such matters. As stated in *Commonwealth v. McGrew*, 375 Pa. 518, 524, 100 A.2d 467, 470 (1953):

> "Neither the Commonwealth nor the defendant is entitled on the voir dire of the jury to inquire concerning what the jurors' present impressions or opinions are. The only question ... is whether they have formed a fixed opinion."

In a similar vein this court has found that:

> "... a prospective juror's 'feelings' concerning the presumption of innocence to which appellant was entitled were of no moment, except to the extent that those feelings were unalterable. Since appellant's questions did not address the fixed nature of such feelings, it need not have been asked." *Commonwealth v. Legree*, 256 Pa.Super. 128, 135, 389 A.2d 634, 637 (1978).

■ In the instant case, the questions as worded, invited confusion in addition to inappropriate responses not affecting the relevancy of a juror's fixed inability to render an impartial judgment. Therefore, we find that the trial judge did not abuse his discretion in refusing to include appellant's proposed questions in the voir dire examination.

■ Appellant's next contention concerns the propriety of the lower court's ruling permitting the appellant's expert witness to be impeached by the contradictory testimony of another witness called by the defense. Appellant argues that the contradicted testimony involved a collateral matter which is never a proper subject for impeachment in this particular manner. While appellant has correctly stated the law, we do not find that the testimony contradicted by the defense witness involved a collateral matter.

Appellant's expert witness, Dr. Milton Alter, testified on cross-examination by Mr. Trushel to the following:

Q. You are suggesting that the neurosurgeon asked your advice as to how he is supposed to technically perform this operation? Is that what you said?

A. What I said, counselor, is that we discuss technical aspects of the case. He discusses his technique and what he had to do in a particular case and what he found and how he managed it.

And I indicate that the results were with similar techniques in other patients that I have followed with him or that I have referred to him. There is an intimate, frequent, constant formalized, regular exchange of information between us.

And, I have had that privilege of that experience not only with Dr. Buchheit but with many neurosurgeons in all of the academic institutions where I have ever worked.

. . . . .

Q. Now, you told us that you have been at Temple University three years, I believe?

A. Yes, three years, or a little over three years.

Q. During that period of time, how many occasions have you had to have been called in on consultation on a case which involved the elevation of a depressed skull fracture with postoperative epidural venous bleeding?

A. If I may be allowed some latitude, I would estimate ten.

Q. And you would have been called on those cases by the neurosurgical service headed by Dr. Buchheit, is that right?

A. Yes.

Doctor William Buchheit, Chairman of the Department of Neurosurgery at Temple University Hospital, was later called by counsel for Doctor Kessler to rebut Dr. Alter's testimony relating to his involvement in postoperative care of patients who had undergone an elevation of a depressed skull fracture.

Q. The question I want to ask you, Doctor, is if it is correct that Dr. Alter's answer "That's right", that he would have been called in on many occasions in consultation for postoperative care relative to patients who have undergone an elevation of a depressed skull fracture, is that answer correct?

A. No, sir, it is not correct.

Q. What is not correct about it?

A. We do not ask the neurologist to see our patients following surgery.

Q. That is handled strictly by the department of neurosurgery?

A. Yes, sir, absolutely.

Q. Do you recall of any case of Dr. Alter having been called in on consultation of such cases?

A. No, sir, I have no recollection of it ever happening?

Q. All right. Now, Doctor Buchheit Dr. Alter was again asked another question . . . whether or not he had been called in consultation for postoperative care of patients suffering from epidural venous bleeding. His answer was that he was called in on consultation in at least ten cases involving patients who were suffering from postoperative epidural venous bleeding.

Doctor, is that answer correct?

A. No, sir, that is incorrect.

Q. What is incorrect about that answer?

A. Incorrect in both the number of cases and in the basic premise that we would call him. To the best of my recollection, in my entire professional career, I have only seen three patients in our institution with postoperative blood clots, epidural blood clots. Not ten. And, if I saw one, I wouldn't call him anyhow.

Q. When you say . . . so we understand, when you say postoperative epidural bleeding, would that include venous and arterial bleeding?

A. Yes, sir, of all origins.

Q. So, you have only seen three, and he hasn't been called in on any of them?

A. That is correct.

Appellant attempted to undo the damage by recalling Dr. Alter to specify, through his office records, the exact number of cases involving postoperative care of depressed fractures he consulted on. Dr. Alter, claiming lack of time and poor record keeping, was only able to arguably present three cases relating to this type of postoperative care.

The thrust of appellant's argument is that Dr. Alter was examined as to his qualifications before testifying as to his expert opinion and he was deemed competent to do so by the court and opposing counsel. Since there was no question concerning Dr. Alter's competency to render an expert opinion in this particular type of medical malpractice action, appellant maintains that any subsequent attack on Dr. Alter's qualifications involved a collateral matter. In other words, appellant's argument is that once an expert is deemed competent to testify, further inquiry into this area is a side issue, not relevant to the issues in the case and not subject to contradiction by the testimony of another witness.

■ It is clear in Pennsylvania that a witness cannot be contradicted on collateral matters. *Papa v. Pittsburgh Penn-Center Corporation,* 421 Pa. 228, 218 A.2d 783 (1966). The rationale for this rule of evidence has been clearly set forth in *Commonwealth v. Petrillo,* 341 Pa. 209, 223, 19 A.2d 288, 295 (1941):

No witness can be contradicted on *everything he testifies to* in order to "test his credibility." The pivotal issues in a trial cannot be "side-tracked" for the determination of whether or not a witness lied in making a statement about something *which has no relationship to the case on trial.* The purpose of trials is not to determine the ratings of witnesses for general veracity. A witness can be contradicted only on matters germane to the issue trying. There is no rule more firmly established than this: "No contradic-

tion shall be permitted on collateral matters." (Emphasis in the original).

The application of these principles in the case at hand requires us to find that the contradicting testimony was properly allowed. It cannot be doubted that *the* main issue in this case was whether or not any or all of the appellees provided appellant with negligent care which caused her physical deficiencies. Dr. Alter was appellant's only expert witness and necessarily, the success of appellant's case, hinged on his testimony. The dispute concerning Dr. Alter's actual participation in cases of post-operative care for patients with depressed skull fractures was certainly relevant to the extent of his experience in these matters and, to some degree, the basis upon which his expert opinion rested. Undoubtedly, this matter went to the very heart of the issue being tried. Although Dr. Alter was found to be competent to give an expert opinion in this case, such did not preclude further inquiry into the amount and extent of his experience underlying that opinion. Experts, notwithstanding their competency to render an opinion, are not all equally experienced and qualified. Once hurdling the initial determination of competency, we believe that challenging the relative scope of an expert's experience is not a collateral matter.

Appellant further contends that the lower court erred in refusing to instruct the jury on res ipsa loquitur. Appellant is correct in asserting that res ipsa loquitur is applicable in a medical malpractice action. *Jones v. Harrisburg Polyclinic Hospital, et al.,* 496 Pa. 465, 437 A.2d 1134 (1981); *Gilbert v. Korvette's,* 457 Pa. 602, 327 A.2d 94 (1974) (specifically adopting Restatement of Torts 2d § 328D).

Section 328D provides:

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

(2) It is the function of the court to determine whether the influence may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

We have thoroughly reviewed the record in this case and cannot conclude that appellant's injuries were of the type that would not have ordinarily occurred in the absence of negligence or that there is sufficient evidence to eliminate "other responsible causes" beyond the alleged negligence of the appellees. Therefore, the lower court did not err in refusing to instruct the jury on res ipsa loquitur.

Appellant's fifth contention is that the lower court erred in permitting the appellees' experts to testify as to the cause of appellant's condition. This contention is based on allegations that the appellees' expert reports were submitted in an untimely fashion and that the reports did not contain sufficient findings and conclusions pursuant to Allegheny County Local Rule 212. Appellant argues that although the expert reports do state that the appellant's condition was not caused by the treatment she received while under the appellees' care, the reports do not contain any theories as to what did, in their opinion, cause appellant's condition.

One of appellant's theories of causation developed at trial by Dr. Alter was that during postoperative treatment she experienced an epidural hemorrage in the area of the depressed fracture which created pressure and ultimately resulted in crushing or atrophy of the cerebellum. Another theory advanced by Dr. Alter was that bleeding located in the posterior fossa near the cerebellum was the cause. Dr. Alter testified as to the various symptoms that appellant experienced during post-operative treatment which, he

maintained, supported his theories as to what, in fact, did happen and that the appellees, failing to recognize the same, were negligent.

The main thrust of the appellees' experts' testimony was that appellant's theories of causation were not possible under the circumstances. They testified that appellant could not have suffered the injuries that she did as a consequence of the operation or the post-operative treatment. They also testified that, in their opinion, appellant's condition was caused by the initial trauma, i.e., being struck in the head with the glass bowl and the subsequent seizure.

Generally, Allegheny County Local Rule 212 requires that any party who elects to call an expert witness at trial must list the name, address and a report by that expert in a pre-trial statement. The report must contain "findings and conclusions."

The lower court, in permitting the appellees' experts to render an opinion on causation placed emphasis on the fact that for six (6) years prior to trial appellant alleged that her condition was caused by hypoxia. This theory necessarily involved the operation itself and was not related to post-operative care. It was not until two months before the trial that appellant changed her theory to allege that her condition was caused by negligent post-operative care. Appellant was then permitted, over the objections by the appellees, to substitute Dr. Alter as her expert witness to assert that theory. The appellees submitted the names and reports by their experts just before and at the beginning of trial to rebut appellant's theory.

Appellant contends that because of the last minute submission of the expert reports by the appellees and the inadequate findings and conclusions contained therein, she was prejudiced in not being able to adequately prepare for cross-examination to challenge the appellees' experts opinions concerning causation. We do not agree.

The rationale for any pre-trial rule is to insure that the trial itself can proceed in a smooth and orderly fashion. This, of course, requires adequate preparation by counsel trying the case. Rule 212 facilitates preparation by requiring disclosure of the nature of an expert witness' testimony before trial.

When the procedural history of this case is taken into consideration, along with the theories asserted by the appellees' experts, we do not believe the lower court erred in permitting this testimony.

██ Notwithstanding the last minute alterations which preceded trial in this case, we find that the expert reports submitted by the appellees were sufficient. Although the reports did not specifically contain assertions to the effect that appellant's condition was caused by the initial injury, there is no question that counsel for appellant was fully aware of that event and necessarily, in preparing the case, had to take into consideration the possibility that such injury was the cause precipitating her condition. Obviously, appellant was fully informed as to the incident, and certainly could not claim surprise at trial. Therefore the testimony was properly admitted. A finding to the contrary would be an overzealous application of Rule 212. See, *Piekarski v. Club Overlook Estates, Inc.,* 281 Pa.Super. 162, 421 A.2d 1198 (1980).

Appellant's next contention is that the lower court erred in refusing to remove a juror or alternatively declare a mistrial. Appellant, at trial, reported to the lower court that one of the jurors had complained to the tipstaff that because of the length of the trial he was losing a lot of money. Appellant's counsel requested the court to remove that juror for cause and substitute an alternate or that he be withdrawn. The lower court refused.

██ The substitution or withdrawal of a juror is within the sound discretion of the trial judge, whose decision will

not be reversed in the absence of an abuse of that discretion. *Commonwealth v. Fennell,* 444 Pa. 1, 278 A.2d 884 (1971). After reviewing the record, and specifically the alleged comments made by the juror, we find that the trial judge did not abuse his discretion in refusing to grant appellant's motion to withdraw or substitute that juror.

Appellant's final contention is that the lower court erred in refusing appellant's request to instruct the jury on the issue of punitive damages. Appellant contends that punitive damages were appropriate in this case in light of false information contained in appellant's discharge summary report signed by Dr. Kessler.

In *Focht v. Rabada,* 217 Pa.Super. 35, 38, 268 A.2d 157, 159 (1970) this court stated:

Pennsylvania has adopted the rule of punitive damages as set forth in § 908 of the Restatement of Torts and the comments thereunder. Section 980(1) provides: "Punitive damages are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." Comment (b) to the above section states that "Punitive damages are awarded only for outrageous conduct, that is, for acts done with a bad motive or with reckless indifference to the interests of others." See *Chambers v. Montgomery,* 411 Pa. 339, 344, 192 A.2d 355 (1963). Thus, the Pennsylvania rule allows the awarding of punitive damages when the act is done with reckless indifference as well as with bad motive.

 Dr. Kessler admitted at trial that there were inaccurate statements in the discharge summary which he signed. However, our review of the record, does not show any evidence to demonstrate that Dr. Kessler's actions were "outrageous," badly motivated or recklessly indifferent. We conclude, therefore, that the lower court did not err in refusing to instruct the jury on punitive damages.

Order affirmed.