## Mansour v. Linganna

C.P. of Lawrence County, no. 11007 of 1996, C.A.

*Carmen F. Lamancusa,* for the plaintiffs.

*Leo M. Stepanian II,* for the defendant.

PRATT, *P.J.,* May 4, 2001—The plaintiffs' negligence cause of action for personal injuries, after an automobile collision, was tried before a jury, which found defendant liable to plaintiffs and awarded damages in the amount of $70,000. Defendant timely filed a motion for post-trial relief, requesting a new trial based on several assignments of error. On December 8, 2000, the court entered an order denying defendant's motion, from which defendant filed his notice of appeal and statement of matters complained of on appeal. This opinion is rendered in satisfaction of Pa.R.A.P. 1925(a).

Before addressing each objection of defendant in his motion for post-trial relief, the court recalls the general rule regarding granting a new trial, *i.e.,* a new trial should be granted only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Craft v. Hetherly,* 700 A.2d 520 (Pa. Super. 1997). The trial court may also award a new trial upon concluding that a factual or legal mistake was made at the trial level and that, on consideration of the particular circumstances of the case, the mistake formed "sufficient basis" to order a new trial. *Riccio v. American Republic Insurance Co.,* 550 Pa. 254, 262, 705 A.2d 422, 425 (1997). The court will now consider each contention set forth in defendant's request for a new trial.

I.

Defendant initially claims it was error for the court, during jury selection, to allow the potential jurors in this case to be asked the following voir dire question:

"How many of you have heard of the '*McDonald's* Verdict' and feel it was ridiculous or that something was wrong with the court system or that we need to do something to prevent verdicts like that in the future?" Notes of Testimony March 6, 2000, p. 75.

Defendant timely objected to this question, claiming that it tainted the jury with a bias toward plaintiffs; was prejudicial to defendant; and that the *McDonald's* case is contrary to Pennsylvania law, because it was not decided in Pennsylvania. Allowing this voir dire question, according to defendant, is reversible error, because it permitted the jury to equate the defendant in the instant matter to the wealthy defendant in the *McDonald's* case and led the jury to consider the defendant's wealth in the instant case in arriving at its verdict. Defendant also argues that the question improperly requested the potential jurors to express their opinion concerning a hypothetical set of facts that existed in the *McDonald's* case. The court disagrees.

The trial court is given broad discretion in determining the scope, manner and procedure of the voir dire examination. *Starr v. Allegheny General Hospital,* 305 Pa. Super. 215, 220, 451 A.2d 499, 501 (1982). The purpose of voir dire is to ensure the empaneling of a competent, fair, impartial and unprejudicial jury. *Id.* "The preferred practice during voir dire examination is to permit general inquiries regarding the direct or indirect interest of the jurors in the parties to, and the result of, the litigation." *Bohner v. Stine,* 316 Pa. Super. 426, 435, 463 A.2d 438, 448 (1983).

The court finds no indication, in this case, that the voir dire question regarding the *McDonald's* case caused

any prejudice toward defendant or tainted the minds of the potential jurors in a way that would cause them to equate the wealth of the defendant in his case to the wealth of the defendant in the *McDonald's* case. Furthermore, the court does not find that the subject voir dire question caused the jurors to express their opinion concerning a hypothetical set of facts that existed in the *McDonald's* case. The court finds that the question was merely a general inquiry to see if the prospective jurors had any direct or indirect interests in the outcome of the lawsuit.

## II.

Defendant also objected to a statement made by plaintiffs' counsel during closing arguments in which the *McDonald's* case was again mentioned. During closing arguments, plaintiffs' counsel, stated, at least twice, that "this is not a frivolous lawsuit." N.T., March 10, 2000, pp. 132 and 149. On one occasion, counsel for plaintiffs stated:

"One of the questions I asked all of you was this. When I came into this courtroom, I said the question was asked about—I think it was—I don't know if I misstated it. I apologize to all of you. I think one of the questions was about the *McDonald's* case and how people felt about it with the hot coffee spill and everything else. This is not a frivolous lawsuit. This is not a frivolous accident . . . ." N.T., March 10, 2000, pp. 148-49.

Defendant contends that these statements, in closing argument, tainted the jury with a bias toward plaintiffs and were prejudicial to defendant. Defendant argues that these statements suggested to the jury that their verdict

should be in a significant amount, reasoning that, because the *McDonald's* case was a multi-million dollar award, many people considered it to be a frivolous lawsuit; therefore, if the jury believes the instant case is not frivolous, they could assume that their verdict should be larger than that given in the *McDonald's* case.

The presentation of closing arguments and the decision to declare a mistrial based on objections thereto is within the discretion of the trial court, "whose vantage point enables it to evaluate the climate of the courtroom and the effect on the jury of closing arguments." *Clark v. Philadelphia College of Osteopathic Medicine*, 693 A.2d 202, 206 (Pa. Super. 1997). "Furthermore, a new trial is not required where the remarks made by counsel were neither inflammatory nor prejudicial." *Alexander v. Carlisle Corp.*, 449 Pa. Super. 416, 422, 674 A.2d 268, 271 (1996).

In this case, the court finds that plaintiffs' counsel's statements in closing arguments did not taint the jury's view nor did they prejudice the defendant. Notwithstanding, the meaning and purpose of plaintiffs' counsel's closing statements regarding the *McDonald's* case were perplexing and difficult to grasp. Defendant's interpretation of the statement is tenuous, at best. The court cannot conclude that the jury would reasonably be led to believe, based on the above quoted closing statements by plaintiffs' counsel, that the verdict in this case should be larger than the multi-million dollar verdict in the *McDonald's* case. As plaintiffs' counsel's closing argument was neither inflammatory nor prejudicial, a new trial is not warranted on this basis.

## III.

Defendant next claims it was error for the court to permit plaintiffs to recall their expert medical witness, Dr. Robert Gilliland, by telephone deposition during trial for the purpose of establishing plaintiffs' future medical expenses relative to his prescriptions for Oxycontin, a medication prescribed for pain management. Defendant claims that permitting the recall of Dr. Gilliland for the limited purpose of establishing plaintiffs' future need and use of medication for pain management was prejudicial to defendant, because defendant did not and could not have any opportunity to obtain rebuttal evidence without delaying the trial for an extended period of time.

Furthermore, defendant claims that the necessity and reasonableness of prescribing Oxycontin was not asked at the deposition of Dr. Gilliland and, therefore, defendant had no need to seek rebuttal testimony addressing the issue. According to defendant, permitting plaintiffs to take the deposition of Dr. Gilliland during the course of the trial amounted to unfair surprise and prejudice. The court disagrees.

Defendant's argument regarding Dr. Gilliland's testimony by telephone deposition at trial is, in essence, based on what is known as the "fair scope rule." As explained by the Superior Court:

"The 'fair scope rule,' . . . derives from our Rules of Civil Procedure governing discovery. Rule 4003.5 provides that a party may, during discovery, require his adversary 'to state the substance of the facts and opinions to which [his or her] expert is expected to testify and a

summary of the grounds for each opinion.' Pa.R.C.P. 4003.5(a)(1)(b). The purpose of this provision is 'to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony.' " *Feden v. Consolidated Rail Corp.,* 746 A.2d 1158, 1161 (Pa. Super. 2000), citing *Tiburzio-Kelly v. Montgomery,* 452 Pa. Super. 158, 173, 681 A.2d 757, 764 (1996).

The Superior Court has also noted that: "[t]he experience of this court . . . has been that it is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to disclose, at his adversary's request, 'the substance of the facts and opinions to which the expert is expected to testify' is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony." *Wilkes-Barre Iron & Wire Works Inc. v. Pargas of Wilkes-Barre Inc.,* 348 Pa. Super. 285, 290, 602 A.2d 210, 212 (1985).

Based on these cited authorities, the court must look to the facts and circumstances of the instant case to determine whether defendant was unfairly surprised by the introduction at trial of Dr. Gilliland's testimony regarding the necessity and reasonableness of plaintiff Haisam Mansour's Oxycontin prescription.

On the fourth day of the jury trial, counsel for plaintiffs asked to recall Dr. Gilliland by telephonic deposition as a means to introduce the testimony that would

be related to the testimony expected to be offered by plaintiff Nahla Mansour in regard to purchase of the medication, Oxycontin, for plaintiff Haisam Mansour. During an in camera colloquy, counsel for plaintiffs made the following offer of proof:

"Mr. Lamancusa: I'm only going to ask several questions here. The questions are going to be, number one, is he receiving—is he receiving any medication, Doctor. His answer will probably be yes to that. And what is the type of medication? I'm treating him with Oxycontin. What is the purpose of the Oxycontin? Why do you have that treatment, this medication for him? Will he receive this—what's his prognosis with the use of Oxycontin? Is he going to have to continue to use it into the future? That's all I need. With that I can put my client on the stand.

"The Court: Well, is he going to also testify that the charges for the medication are reasonable?

"Mr. Lamancusa: Reasonable, yes.

"The Court: Is he also going to testify that—that his use of the medication is related to the November 7, 1994 accident?

"Mr. Lamancusa: Yes." N.T., March 9, 2000, pp. 1-2.

Defendant argues that, if plaintiffs' counsel had asked these questions during the original deposition, defendant would have had his doctor available for rebuttal. N.T., March 9, 2000, p. 6. Plaintiffs argue that defendant was aware of the pain medications being used by plaintiff Haisam Mansour. Plaintiffs further argue that defendant had ample opportunity, through deposition and interrogatories, to cross-examine Dr. Gilliland on the

significance of plaintiff Haisam Mansour's medication for pain management. N.T., March 9, 2000, p. 7.

In this case, although Oxycontin was not specifically mentioned by name, Dr. Gilliland's medical reports clearly indicate use of prescribed pain medication in the treatment of plaintiff Haisam Mansour. Additionally, prior to the trial, Dr. Gilliland's deposition was taken on January 7, 2000. In this discovery deposition, Dr. Gilliland specifically referred to the use of Oxycontin in treating plaintiff Haisam Mansour. (Transcribed notes of testimony of video deposition of Dr. Gilliland, January 7, 2000, pp. 21 and 33.)

Furthermore, the court recognized that defendant's expert, Dr. Michael Zernich, had records before him indicating plaintiff Haisam Mansour's prescriptions for pain medication and, therefore, defendant should not be surprised or prejudiced by the recall of Dr. Gilliland to clarify plaintiff Haisam Mansour's future need for Oxycontin. N.T., March 9, 2000, pp. 1-16.

Defendant also suggests that, because the parties agreed that no evidence of plaintiff Haisam Mansour's drug use would be entered as evidence, it was reasonable for defendant to believe no such evidence would be introduced at trial. The court finds this argument disingenuous.

First, the court notes that the agreement is not of record and appears to have been made orally between counsel for both parties without the benefit of the record. The court was first informed of the agreement during pretrial conference discussions regarding plaintiffs' motion in limine, requesting the exclusion of evidence of plaintiff Haisam Mansour's prior conviction

of criminal mischief. During those discussions, counsel explained to the court that the parties had agreed there would be no evidence presented regarding any propensity of plaintiff Haisam Mansour to use drugs relative to the issue of drug addiction. Based on the nature of the agreement as described by counsel during discussions with the court, the court finds it was not reasonable for defendant to believe that all evidence of any use of drugs, including prescriptions for the medical treatment of plaintiff Haisam Mansour's pain, would be excluded at the trial of this case.

Given that the recall of Dr. Gilliland was for the limited purpose of establishing future medical expenses as related to plaintiff Haisam Mansour's Oxycontin prescriptions and that the pleadings had previously referred to plaintiff Haisam Mansour's prescribed pain medications, the court properly permitted the telephonic deposition of Dr. Gilliland during the trial of this case.

## IV.

In regard to the telephone deposition of Dr. Gilliland, defendant also objects to the court's questioning of the witness on the grounds it was prejudicial to defendant and that the court interjected itself into the trial as an advocate for plaintiffs. The defendant so strenuously argued this point that he suggested the trial judge in this case violated a Canon of Judicial Conduct, although defendant has failed, thus far, to file a formal complaint with the Judicial Conduct Board.

On direct examination by counsel for plaintiffs, the following testimony was elicited from Dr. Gilliland during the telephonic deposition:

"Q. Doctor, is Oxycontin necessary and reasonable treatment for Haisam Mansour?

"A. For his type of problem, it is the ideal or best treatment for him for pain control.

"Q. Doctor, what is his prognosis relative to the receipt of the same prescription of Oxycontin into the future?

"A. We have arrived at a level of medication which gives him comfort, so that we will continue into the future with the same medication without probably going up in dosage. He takes the other medications in supplement to the Oxycontin, but the main medication for him is the Oxycontin and it is a stable dose and he will continue that into the future." N.T. March 9, 2000, pp. 3-4.

The court then questioned Dr. Gilliland as follows:

"Q. Doctor, how do we know this medication prescribed is related to the accident of November 7, 1994?

"A. The pain that he had following that, and I have seen him, you know, many years back, even after that accident, and followed the pain profile that he has, and I have done many, many trigger point injections into his neck and back. So, I have had on many, many occasions the opportunity of evaluating, examining his neck and back. So, the pain that he has had is certainly related to that accident and certainly requires this medication." N.T. March 9, 2000, p. 6.

After cross-examination and redirect examination, the court then asked:

"Q. —this prescription or medication you prescribe, are you planning on prescribing that in the future to this patient?

"A. Yes, sir, every month.

"Q. For how long?

"A. Indefinitely, as long as he has the chronic pain problem, and his type of pain problem cannot be resolved, say, by surgery or by any other means. So, we are using this medication as a matter of pain control." N.T. March 9, 2000, p. 8.

Unless it can be determined that interrogation of a witness by the trial judge amounts to an abuse of discretion, so that "prejudice, bias, capricious disbelief or prejudgment" is discernible, a new trial will not be granted. *Smith v. Barker,* 368 Pa. Super. 472, 478, 534 A.2d 533, 536 (1987). Furthermore, "a trial judge has the right and sometimes the duty to interrogate witnesses." *Carney v. Otis Elevator Co.,* 370 Pa. Super. 394, 401, 536 A.2d 804, 807 (1988). "When an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination." *Id.* at 402, 536 A.2d at 807.

In the instant case, during examination of Dr. Gilliland, it was plaintiffs' counsel who elicited testimony regarding the use, cost, reasonableness, and necessity of plaintiff Haisam Mansour's Oxycontin medication. The court merely clarified the direct testimony of Dr. Gilliland to expand upon the relationship between plaintiff Haisam Mansour's Oxycontin treatment and the collision. The court's question as to how long Dr. Gilliland planned to continue prescribing Oxycontin in the future only clarified plaintiffs' counsel's question put forth on direct examination as to the physician's prognosis relative to prescribing Oxycontin in the fu-

ture. Thus, the court finds no merit to defendant's objection to the court's examination of Dr. Gilliland.

## V.

Also, related to the telephone deposition of Dr. Gilliland is defendant's objection to testimony of plaintiff Nahla Mansour and Dr. Gilliland regarding the cost of the Oxycontin medication. Defendant argues there was no evidence that the first-party benefits had been exhausted as required by section 1722 of the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S. §1722.

Whether first-party benefits were exhausted was discussed and argued at length during the trial when defendant raised this objection. N.T., March 9, 2000, pp. 31-36. Defendant argued that evidence, showing first-party benefits had been exhausted, was required to be presented to the jury along with proof of plaintiffs' payment, such as credit card receipts and canceled checks. The court found no authority to support such a proposition. Parenthetically, the court observes that defendant relied on *Carlson v. Bubash,* 432 Pa. Super. 514, 639 A.2d 458 (1994) in his brief in support of defendant's motion for post-trial relief. This case, however, does not support defendant's argument in any way. *Carlson* stands for the proposition that, when evidence of medical expenses is precluded under section 1722 of the Pennsylvania Vehicle Financial Responsibility Law, it is also inadmissible for purposes of showing pain and suffering. The case does not address any matter regarding proof required at trial that first-party benefits have been exhausted.

Furthermore, the court found sufficient basis existed to support a finding that the first-party benefits had been exhausted in this case. Plaintiffs' counsel explained they were attempting to recover medical expenses paid by Medicare, and Medicare had been given the right of subrogation against any party responsible for plaintiff Haisam Mansour's injuries. N.T. , March 7, 2000, p. 2. Counsel for plaintiff also noted that a copy of a letter from plaintiffs' insurance carrier was provided to defendant along with a letter from plaintiffs' counsel stating that the first-party benefits had been exhausted. N.T., March 9, 2000, p. 31. Counsel for defendant conceded that the letter from plaintiffs' counsel was received, but could not recall whether a letter from plaintiffs' insurance company had been received. N.T., March 9, 2000, pp. 32-33.

The court was persuaded that the first-party benefits were exhausted. N.T., March 9, 2000, p. 35. Therefore, in accordance with section 1722 of the Pennsylvania Vehicle Financial Responsibility Law, 75 Pa.C.S. §1722, only evidence of expenses beyond the first-party limits was admissible at trial. Consequently, defendant's contention raising first-party benefits and plaintiff Nahla Mansour's medical expenses is rejected.

## VI.

Defendant further contends that the court erred in redacting and refusing to permit the testimony of Dr. Michael Zernich pertaining to plaintiff Haisam Mansour's drug use, which D. Zernich opined was part of the reason for plaintiff Haisam Mansour's complaints of pain related to the instant car collision. Given that

plaintiff Haisam Mansour and Dr. Gilliland testified with regard to plaintiff Haisam Mansour's need for narcotic drugs, defendant argues the court's refusal to allow Dr. Zernich's testimony effectively disallowed rebuttal testimony to Dr. Gilliland's telephone deposition and excluded relevant testimony. According to defendant, the relevance of Dr. Zernich's testimony outweighed any prejudicial effect, especially considering plaintiffs' claim for permanent injury. The court again disagrees.

As stated in *Clinton v. Giles,* 719 A.2d 314, 318 (Pa. Super. 1998):

"Where the issue raised involves the admissibility of evidence, we note that 'Pennsylvania trial judges enjoy broad discretion regarding the admissibility of . . . evidence.' In exercising that discretion,

"[t]he threshold task of the trial judge . . . is to determine whether the evidence is relevant. Once the trial judge determines the evidence is relevant, the further task of the judge is to balance the probative value of evidence against any prejudicial effect of that evidence. Since such balancing is a particular specialty of the trial judge, rulings upon admissibility are committed to the sound discretion of the trial court, and those rulings will not be overturned in the absence of an abuse of discretion." (citations omitted)

In this case, the court redacted that portion of Dr. Zernich's testimony concerning plaintiff Haisam Mansour's apparent past drug addiction. The court found that this testimony was probative as to the issue of whether plaintiff Haisam Mansour's future medical expenses were related to the automobile collision, but further concluded that the prejudicial effect of Dr.

Zernich's testimony outweighed its probative value. N.T., March 10, 2000, pp. 17-18.

In making the ruling to exclude Dr. Zernich's testimony because of its prejudicial effect, the court also considers the likelihood that introduction of such evidence would have confused and/or misled the jury by broaching other unrelated issues, such as which particular medications or drugs plaintiff Haisam Mansour was addicted to and whether they were similar to those prescribed for plaintiff Haisam Mansour's injuries related to the collision in this case. Hence, the objection must be dismissed. See Pennsylvania Trial Guide, Evidence §11.2 (3d Rev. ed. Supp. 1999); *Gallegor by Gallegor v. Felder,* 329 Pa. Super. 204, 478 A.2d 34 (1984); *Geesey v. Albee Pennsylvania Homes Inc.,* 211 Pa. Super. 215, 235 A.2d 176 (1967).

## VII.

Lastly, defendant argues that it was error for the court to allow plaintiff Haisam Mansour to testify as to his son's injuries and condition at the scene of the collision without issuing a cautionary instruction to the jury informing them that plaintiffs' son's injuries and condition are not relevant to the instant case, because plaintiffs' son is not a party to the action. The following excerpts from the trial are relevant to defendant's objection regarding plaintiff Haisam Mansour's direct testimony concerning his son's condition.

"Q. Okay. And what happened to—what happened to your vehicle in this collision?

"A. I got hit head on, like side, you know, head on like that, and then the next thing I know, I grab my son, you

know, and I got thrown out like, you know, frontward all the way, and then I look up. I saw the van come back. Then the collision hit me again on the side. I thought he was going to tip over. So, I dove over my son, you know, and then next thing I know, my car went to the ditch there and his van went down, I would say, a thousand foot down. When I look up, I see his van down the road.

"Q. Where were you, though?

"A. Between the seat. I'm on my son. My son isn't conscious. I can't get him to, you know, try talk to him, you know, get him and talk to me, and he just unconscious.

"Q. Okay. And what did you do at that point?

"A. I kept, you know, shaking him up.

"Mr. Stepanian: Objection. May we approach the bench?

"*Side Bar*:

"The Court: Let's hear the objection.

"Mr. Stepanian: The injuries to his son are irrelevant to this case, and I know he is going to go into more of what his son says, this, that and the other. I went through the deposition with him. He is going to talk excessively about his son, and I want to get that—

"Mr. Lamancusa: He is not going to talk about his son. The only question is what did you do next. That's all.

"The Court: Well, I thought we were—that when he was called, we weren't going to get into the negligence part of it, we were going to go directly to the impact and the nature of the impact.

"Mr. Lamancusa: That's where we're at now, at the impact, your Honor.

"The Court: All right. Then, limit the testimony regarding the son, because it really isn't relevant.

*"End Side Bar:*

"Q. Haisam, in that regard, when you were there inside the interior of the automobile with your son positioned down below, did you try to get out of the automobile?

"A. First I tried to get my son to respond.

"Q. Okay. I understand that.

"A. Then, I try to get out of the vehicle. Door don't want to open.

"Q. And after the door—after the door was opened, did you get out of the vehicle?

"A. Yes, I did. I got out of the vehicle and I got my son, me and the lady, and grabbed him and took them all the way around and lay him on the grass. Okay.

"Q. Where did you stand at that point?

"A. I stand with my son try to, you know, try to get him to talk.

"Q. Did you look at the automobile at all, the damage done to your automobile?

"A. No, I didn't pay attention. I'm with my son respond to me.

"Q. Haisam, do you recall the ambulance arriving?

"A. Yes.

"Q. Okay. And what did they do with you, Haisam?

"A. At the time, they told me to sit. You know, the lady told me to sit on the, you know, she take care of my son laying on the grass. She told me sit on—the one ambulance came in and then told me, you know, not to move, you know, and they pick my son up.

"Q. Okay. When the ambulance came, though, Haisam, what happened to you? What did they do? What did the attendant do?

"A. Come in, pick my son up and then they come in and pick me up.

"Mr. Stepanian: Objection. May we approach the bench.

*"Side Bar:*

"Mr. Stepanian: I think talking about his son is prejudicial and I would like a curative instruction, and maybe Mr. Lamancusa would like to take a couple of minutes to talk to his client about not referring to his son so that we don't run into this problem." N.T. March 8, 2000, pp. 93-104.

The court, in exercising its discretion, did not issue a curative instruction to the jury. However, the court directed counsel for plaintiffs to instruct plaintiff not to mention his son again. Thereafter, no further mention was made of plaintiffs' son.

As noted previously, in citing *Clinton, supra,* the trial judge has broad discretion in deciding issues of admissibility of evidence. "Evidence is relevant if it tends to make a fact at issue more or less probable." *Henery v. Shadle,* 443 Pa. Super. 331, 341, 661 A.2d 439, 444 (1995). Furthermore, "[a]ny evidence which tends to establish facts in issue or in some degree advances the inquiry at hand is relevant." *Id.*

In exercising its discretion, the court finds, in this case, that plaintiff Haisam Mansour's statements regarding his son's condition at the time of the collision were relevant in determining the severity of the impact of the collision. The court concludes that the probative value

of these statements outweighed any prejudicial effect they may have had.

Based on the above analysis of defendant's assignments of error, the court finds that the verdict in this case was not shocking to one's sense of justice and that a factual or legal mistake was not made which formed a sufficient basis upon which to order a new trial. Therefore, defendant's motion for post-trial relief was properly denied.

### ORDER

The court directs that the attached opinion shall be filed, and the Prothonotary is directed to immediately transmit the record to the Superior Court.